GALVESTON MARITIME ASSOCIA-
TION, Inc., and Texas Transport
& Terminal Co., Inc.

v.

SOUTH ATLANTIC & GULF COAST
DISTRICT, INTERNATIONAL LONG-
SHOREMEN'S ASSOCIATION, Local
307, International Longshoremen's As-
sociation, and Local 851, International
Longshoremen's Association.

Civ. A. No. 64–G–35.

United States District Court
S. D. Texas,
Houston Division.

Sept. 30, 1964.

Royston, Rayzor & Cook (Bryan F. Williams, Jr.), Galveston, Tex., for plaintiffs.

Sewall Myer, Houston, for South Atlantic & Gulf Coast District, I.L.A.

Mandell & Wright (Herman Wright), Houston, Tex., for Local 307, I.L.A.

Bates & Brock (Warner Brock), Houston, Tex., for Local 851, I.L.A.

NOEL, District Judge.

Plaintiff Galveston Maritime Association, Inc., is a corporation and trade association whose members are owners, operators, agents and stevedores of deep sea vessels loading and unloading at the ports of the State of Texas and Lake Charles, Louisiana. Plaintiff Texas Transport and Terminal Co., Inc., acts as agent and/or stevedore for deep sea vessels at various ports, including the port of Galveston, Texas.

The three defendants, South Atlantic and Gulf Coast District, International Longshoremen's Association, hereinafter called District, and Locals 307 and 851 of the International Longshoremen's Association, hereinafter called Locals, are labor organizations representing employees engaged in longshoring deep sea vessels.

On October 1, 1956, plaintiffs and other employers entered into a contract called Deep Sea Longshore and Cotton Agreement with defendants and other local unions which provided the terms and conditions of employment for employee longshoremen at the Texas ports. This contract, as amended in 1959 and 1963, was in full force and effect at all times material to the questions to be decided by this Court.

On April 2, 1964, Locals refused to furnish labor to perform certain burlaping of bilges and other work in the holds of SS POINT VICENTE, then lying at the port of Galveston, until they were paid for certain cleaning work on the vessel which had been performed by an independent contractor specializing in such work, but who had employed no labor furnished by Locals. Locals contended that the plaintiffs had bound themselves in the Agreement to employ longshore labor to perform this type of work. The

plaintiffs contended that this was specialized work beyond the purview of the Agreement.

To avoid delay in loading the vessel, plaintiffs acceded to the demand of Locals, but paid under protest. Plaintiffs then requested that two issues be submitted to arbitration: (1) whether Locals should be allowed to retain the payment made under protest, and (2) whether defendants are liable for damage sustained by plaintiffs resulting from the delay in loading the vessel before payment was made.

This request to arbitrate was refused by Locals and ignored by District. Plaintiffs then filed the suit now before this Court asking (1) that the defendants be ordered to arbitrate, and (2) that damages be awarded. All defendants answered and filed motions to dismiss. These first motions to dismiss were denied by calendar entry of the Court on June 17, 1964. Pretrial conference was held on June 25, 1964, on which day the three defendants jointly filed a second motion to dismiss. By pretrial order dated July 6, 1964, this second motion to dismiss was denied in part and carried with the case in part. Also by this order and pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the damage issue was severed, leaving before the Court only the cause of action, if any, relating to arbitration. At the invitation of the Court, these parties reappeared on July 10, 1964 to show cause why they should not proceed to arbitration. On this day defendants filed their third motion to dismiss. After hearing the testimony and argument offered, the Court is prepared to render its final opinion.

■ This opinion will be limited to questions concerning the jurisdictional power of the Court to issue an order compelling the parties to arbitrate. It is not intended to reflect any view of the Court on the merits of the controversy, for the right to consider the merits has been reserved by the parties to the arbitral processes provided in their contract. Furthermore, two assertions in the defendants' most recent motion to dismiss

are also properly questions for the arbitrator. The first assertion is that any dispute once existing between the parties is now moot due to an alleged accord and satisfaction. The Court views this assertion as an answer to the merits rather than a fact to be considered in determining jurisdiction. The second assertion is that plaintiffs are barred from arbitration by failing to comply with the procedural conditions precedent in their contract. That this matter is also reserved to the arbitrator is clear from recent cases. In the words of the Supreme Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964):

> "Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."

This has been the view of the Fifth Circuit as expressed in Deaton Truck Line, Inc. v. Local Union 612, 314 F.2d 418 (1962) and the recent opinion of Judge Brown in United Steelworkers of America v. American International Aluminum Corp., 5 Cir., 334 F.2d 147 (1964). Although perhaps unessential on this point, Steelworkers contains language to the effect that the courts have often held that where one party to a collective bargaining agreement makes it clear that it does not intend to arbitrate, then the other party need not go through the useless formalities to set the wheels in motion.

The jurisdictional question now before this Court falls naturally into three parts. The first concerns itself with whether this Court is without jurisdiction due to the asserted fact that under "Taft Hartley" exclusive jurisdiction has been vested in the National Labor Relations Board. Assuming jurisdiction, the second step is to decide if this Court has power to order specific performance of the arbitration clause involved. The third and most difficult part of this question is whether the absence of an alleged necessary party is a bar to the issuance of a complete and binding order.

As to the first part of this question, the Court holds that it has jurisdiction over this suit under § 301(a) of the Labor Management Relations Act of 1947. The exclusive jurisdiction of the National Labor Relations Board over unfair labor practices is unquestioned; however, a breach of contract is not an unfair labor practice.[1] The Fifth Circuit in Lodge No. 12 etc. v. Cameron Iron Works, Inc., 257 F.2d 467 (1958), subscribes to this view and has amplified it to include a situation where conduct is both a breach of contract and also an unfair labor practice. In the language of the Court:

> "However, in this case, we must go one step further because substantially the same conduct here involved would constitute a violation of the contract and an unfair labor practice. The distinguishing point is, that, while an act may be both an arbitrable contract violation *and* an unfair labor practice, a 'breach of contract is *not* an unfair labor practice'; the former is enforced by the courts, the latter by the Board; the former gives to private parties a remedy, the latter uses a private right to effectuate the declared policies of the Act; the former gives a certainty of decision, the latter leaves decision discretionary."

The congressional policy behind Section 301 is quoted by the Supreme Court in Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

> "In conference, however, it was decided to make collective bargaining agreements enforceable only in the courts. 'Once parties have made a collective bargaining contract,' the conference report stated, 'the en-

1. Association of Westinghouse Salaried Employees v. Westinghouse Co., 348 U.S. 437 at p. 443, footnote 2, 75 S.Ct. 489, 99 L.Ed. 510 (1955).

forcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board.' H.R. Conf. Rep. No. 510, 80th Cong., 1st Sess., p. 42."

The landmark case applicable to the second part of the jurisdictional question, whether this Court has the power to order specific performance of an executory agreement to arbitrate, is Textile Workers of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Pertinent passages from this Supreme Court opinion are:

"Plainly the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way."

Also,

"It seems, therefore, clear to us that Congress adopted a policy which placed sanctions behind agreements to arbitrate grievance disputes, by implication rejecting the common-law rule, discussed in Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582, against enforcement of executory agreements to arbitrate."

Also,

"The question then is, what is the substantive law to be applied in suits under § 301(a)? We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."

■ In its Lincoln Mills decision, the Supreme Court notes that it considered the opinion by Judge Wyzanski in Textile Workers Union v. American Thread Co., D.C., 113 F.Supp. 137 (1953) to be the leading decision representing its own point of view. One passage from this opinion of Judge Wyzanski appears particularly helpful in resolving the question now before this Court:

"The second step is to declare that though the federal rule is in general not to enforce specifically executory arbitration agreements, that rule rests on merely weak historical arguments, and should be abandoned whenever, as is the case in the Taft-Hartley Act, there is sufficient indication that the legislation in a particular field intended the maximum degree of enforcement of arbitration contracts."

The Court finds in the above authorities the necessary power to order specific performance of the arbitration clause here involved, and holds further that the pleadings of the parties alone furnish sufficient basis for this result. Evidence offered in this matter serves further to substantiate this conclusion.

The point of inquiry in the third phase of the question is whether in the instant case the Court is without power to issue an effective order due to the absence of an alleged necessary party. The two Locals involved as well as the District are properly before the Court, the International Longshoremen's Association, hereinafter called International, is not. The crux of defendants' contention that the International is a necessary party to these proceedings is found in the first sentence of Rule 27(C) of the Agreement. Quoted in full, this sentence reads:

"Two representatives will be appointed by the International Longshoremen's Association and two representatives will be appointed by the Galveston-Houston Maritime Associations within one week after notification by the grievance committee to the District Office of the ILA's and to the Maritime Associations of its failure to agree, and arbitration is desired."

Defendants point out that the contract expressly names the International as the party to appoint arbitrators, and assert

that because the International has not been made a party to these proceedings the Court is powerless to order it to perform this duty. The Court wishes to make very plain that it is not ordering the International, as such, to do anything and also that any order which may be directed to the parties now before the Court will be only to the effect that they utilize procedures of their own choosing to settle the dispute. That this was the intent at the time of the making of the Agreement is evident from the following language found in Rule 27(C):

> "The decision of a majority of the arbitration committee shall be final and binding upon the parties thereto."

The defendants also contend that the District is not involved in the matters that are the subject of the proceedings here. They assert that any obligation of the District is secondary and that its capacity under the contract is only that of a guarantor. The reasoning behind this position is that the District has incurred no obligations under the contract, that the District is not the International, and that even if the District's liability be the same as that of the International, it is still only the secondary liability of a guarantor. Support for this position is found in the following language of Rule 28 of the contract:

> "The International Longshoremen's Association *guarantees* the full observance of this contract by the individual members of the Association." (Emphasis added.)

It is the view of the Court that any problems created by a lack of a necessary party will disappear when the rights and duties of the District under the contract are found to be the same as those of the International. Locals raise the point that arbitration is an expensive process and since its costs are to be shared equally by "the respective parties," the District could be placed upon a precarious financial footing if this Court were to "set a precedent" by ordering it to arbitration under these circumstances. As stated earlier, this Court has no intention of ordering any of these parties to do anything other than utilize their own grievance procedures in the way and for the purpose that they were intended. It is hard for the Court to visualize an unduly harsh result emanating from such an order.

■ The Court finds ample justification for including the District in its order from that part of Rule 27(C) which states that union arbitrators are to be appointed within one week of notice to the District. Even if merely to receive and pass on this notice were the only function delegated to the District, which is very doubtful, this alone would furnish sufficient ground for naming the District as a party in the Court's order. However, there appears to be much more. Based upon a careful study of the contract involved and upon conclusions drawn from the testimony offered at the hearing, this Court is of the opinion that for purposes of settling disputes arising under the contract, the District *is* the International.

■ This conclusion is amply substantiated. The original Deep Sea Longshore and Cotton Agreement of 1956 named as parties for the Union "the International Longshoremen's Association and affiliated unions." The Court is without information as to how this first agreement was signed. When this contract was first extended in 1959, the first sentence of the extension read:

> "*ILA* proposes extension of Old Contract for three (3) years, October 1, 1959—October 1, 1962."

No reference was made to the International, however, in the form chosen by the Union to execute this extension, which was:

> "Subject to ratification of the Locals
>
> /s/ Ralph A. Massey
> _____
> South Atlantic and Gulf Coast District ILA"

When the agreement was extended for a second time, in 1963, no mention of the International was made at all. Parties

for the Union were identified as the "South Atlantic and Gulf Coast District and its affiliated Deep Sea Locals in the Ports of Texas and Lake Charles, Louisiana." It was executed on behalf of the Union, by the District alone and in the following form:

"South Atlantic & Gulf Coast District ILA

By    /s/ Ralph A. Massey
        Ralph A. Massey, President"

It provided in the second paragraph that
"The parties agree that the Deep Sea Longshore and Cotton Agreement previously in effect between the parties hereto  *  *  *  is hereby extended  *  *  *"

Under these circumstances, the meaning to be given to the words "previously in effect between the parties hereto" should be that the union contract negotiators thought of the District and the International as the same for purposes of the Agreement. Furthermore, the terms "District" and "International" are used interchangeably within the body of the original Agreement. On page 2 the Agreement states that the "South Atlantic and Gulf Coast I.L.A. District and its affiliated unions" are in a position to supply labor. On page 3 the District is given the duty of allocating work to prevent racial discrimination. Also on page 3, the President of the District is handed the responsibility of "coordinating" the total labor supply so that gangs can be provided even if not available from the local ordered.

By way of contrast, and certainly in a situation local in character, the International Longshoremen's Association agrees on page 18 to make every effort to prevent pilferage. This is further evidence supporting the Court's position that when the drafters of the agreement named the International Longshoremen's Association in Rule 27(C) to appoint the union arbitrators, they were making reference to the union as a whole rather than specifically to the International. The applicable rule of law is found in

Florida Canada Corp. v. Union Carbide & Carbon Corp., 280 F.2d 193, (6th Cir. 1960):
"It is also a familiar rule in the construction of contracts that the intention of the parties is to be gathered from the entire instrument and not from detached portions. A contract cannot be disjointed or particular parts separated from the balance, as it is necessary to consider all of the provisions of a contract in order to determine the meaning of any particular part as well as the meaning of the whole document."

Another strong indication that the International, as such, was never a party to the original Agreement is found in the limitation-of-liability clause on page 6. There, provision was made whereby the District by following a certain prescribed procedure could relieve itself of liability for breach of the contract by a local. Similar provision was made on behalf of any local so that the local may not be held liable for non-union conduct of offending members. If the drafters had considered the International to be a party to the Agreement, then certainly the Agreement would have listed a procedure by which the International could also be relieved of liability. But such a procedure is not to be found. Therefore, the only alternative, and one that is far-fetched, to the conclusion that the District and the International are the same in the Agreement is that in certain situations when the District and the Local involved have avoided liability, the International alone will be responsible for non-union conduct of individual union members.

In any event, the contract now in effect, and which has been in effect at all times material to this dispute, is the second extension, and beyond question the only union parties to it are the District and affiliated Locals. While it could have been legally possible under some third-party-beneficiary theory to grant the privilege of appointing arbitrators to the International, the Court finds it much more likely in view of the reasons here-

inbefore set out that the term "International Longshoremen's Association" as appears in the original Agreement is used in the generic sense to refer to the union as a whole, and that in the case of local arbitration, the parties intended the District to appoint union arbitrators.

This Memorandum Opinion shall constitute the findings of fact and conclusions of law of this Court, which the Clerk shall file and of which she shall furnish each of the parties a copy.

The effective date of the order in connection herewith is stayed for thirty days, during which time the parties are invited to present further evidence.